|  |
|---|
| USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:_____<br>DATE FILED:_____ |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

SERGIO FLOREZ,

                      Plaintiff,

        -against-

CENTRAL INTELLIGENCE AGENCY,

                      Defendant.

------------------------------------------------------------

14-Cv-1002 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

    Plaintiff Sergio Florez has filed a request pursuant to the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, with defendant Central Intelligence Agency ("CIA") for records concerning plaintiff's father, Dr. Armando J. Florez, a former high-ranking Cuban diplomat who defected and received political asylum in the United States following an alleged attempt to kill his fiancée by Cuban officials. After the CIA issued a so-called *Glomar* response—in which the agency neither confirms nor denies the existence of any records revealing a classified connection with Dr. Florez—his son filed this litigation to compel disclosure of any responsive records.

    Currently before the Court are the parties' cross-motions for summary judgment, which raise the question of whether the CIA properly issued the *Glomar* response to protect information exempted from disclosure pursuant to 5 U.S.C. § 552(b). Because this Court finds that the CIA's *Glomar* response was justified and the existence of any records is exempt from disclosure under FOIA

1

Exemption 1 (for classified national defense or foreign policy secrets) and Exemption 3 (for matters specifically exempted from disclosure by statute), defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.

## I. BACKGROUND

The following facts are undisputed.

### A. The 2001 FOIA Request

The Freedom of Information Act ("FOIA") "calls for broad disclosure of Government records" but exempts from disclosure information that falls within one or more of the nine exemptions Congress delineated in 5 U.S.C § 552(b). *CIA v. Sims*, 471 U.S. 159, 166-67 (1985).

On February 7, 2001—almost exactly fourteen years ago—plaintiff submitted a FOIA request to the CIA, seeking records pertaining to his father, Dr. Armando Florez ("Dr. Florez"). (*See* Letter from Florez to CIA (Feb. 7, 2001), Ex. 1 to the Declaration of Martha M. Lutz, Chief of the Litigation Support Unit, Central Intelligence Agency, dated April 28, 2014 ("Lutz Decl.").) Dr. Florez was the Cuban chargé d'affaires in Washington in 1960 when the United States severed diplomatic relations with Cuba. (*Id.*) Sergio's request included details about Dr. Florez's personal history, including his post as the Cuban ambassador to Czechoslovakia from 1962 to 1964, his subsequent defection from Cuba in 1967, and his successful request for political asylum in the United States in 1968. (*Id.*)

The CIA responded to Sergio's request in a letter dated February 23, 2001. (Ex. 2 to Lutz Decl.) The CIA acknowledged receipt of the request, asked for additional identifying information regarding Dr. Florez (full name, date of birth, and nationality), and requested a signed, notarized statement from Dr. Florez authorizing the CIA to release his personal records pursuant to the Privacy Act of 1974. (*Id.*) Because Dr. Florez had Alzheimer's disease at the time and was no longer able to read or write, Sergio was unable to furnish the required waiver from his father. (Declaration of Sergio Florez, dated May 12,

2014 ("Florez Decl.") ¶ 35.)  As a result, the CIA provided no information requested by Sergio in his 2001 FOIA request.  (*Id.* ¶ 36.)

### B. The 2013 FOIA Request

Sergio submitted a second FOIA request to the CIA more than a decade later in November 2013, shortly after his father's death.  (*Id.* ¶¶ 37-38; Ex. 3 to Lutz Decl.)  The request sought "information or records regarding my father, Armando J. Florez," and included details about his father's career in Cuban politics as well as a United Press International story about his father's defection from Cuba.  (Florez Decl. ¶ 41; Ex. 3 to Lutz. Decl.)

Upon receiving the second FOIA request, the CIA searched for any responsive records.  Its Information Management Service professionals, under the supervision of the Information and Privacy Coordinator, identified two directorates—or office clusters—which "reasonably might be expected to possess responsive records":  the Directorate of Support ("DS") and the National Clandestine Services ("NCS").  (Lutz Decl. ¶¶ 18-19, 23.)  The DS contains records on "all current and former CIA employees and contractors as well as other individuals for whom security processing or evaluation has been required."  (*Id.* ¶ 20.)  The NCS maintains information on "persons who are of foreign intelligence or counterintelligence interest to CIA and other U.S. government agencies."  (*Id.*)  Information Review Officers within each directorate searched their databases using Dr. Florez's name and other identifying information, but they were unable to locate any records "that reflected an open and acknowledged CIA affiliation and were responsive to Plaintiff's FOIA request."  (*Id*. ¶¶ 24-25).[1]

The CIA responded to the 2013 FOIA request in a letter dated November 20, 2013.  (Ex. 4 to Lutz Decl.)  It acknowledged receipt of the request and informed plaintiff that its search for an "openly acknowledged Agency

---

[1] The Supplemental Declaration of Martha M. Lutz defines records reflecting an "overt or otherwise acknowledged" affiliation as those which contain "unclassified, public fact[s]," such as the public fact that Dr. Florez served as a Cuban diplomat.  (Supplemental Declaration of Martha M. Lutz, dated June 20, 2014 ("Lutz Suppl. Decl.") ¶ 18.)

affiliation . . . did not locate any responsive records." (*Id*.)  With respect to any records beyond those revealing an open and acknowledged CIA affiliation, the CIA invoked the so-called *Glomar* response,[2] neither confirming nor denying the existence or nonexistence of records responsive to plaintiff's request because the existence or nonexistence of such records "is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended, and section 102A(i)(I) of the National Security Act of 1947, as amended."  (*Id*.)  Accordingly, the CIA denied the 2013 FOIA request pursuant to FOIA Exemptions 1 and 3, which govern classified national defense or foreign policy secrets (Exemption 1) as well as matters specifically exempted from disclosure by statute (Exemption 3).

Plaintiff immediately appealed the denial of his 2013 request.  (Ex. 5 to Lutz. Decl.)  The CIA confirmed receipt of his appeal and notified Sergio that "arrangements [were] being made for its consideration by the Agency Release Panel."  (Ex. 6 to Lutz Decl.)

Plaintiff filed the instant action two months later, alleging that the CIA's denial of his 2013 request violated the FOIA, 5 U.S.C. § 552.[3]  On April 22, 2014, the CIA's Agency Release Panel denied plaintiff's administrative appeal of the 2013 request in full.  (Lutz Decl. ¶ 17.)[4]

---

[2]  The term "*Glomar* response" comes from a 1976 opinion of the U.S. Court of Appeals for the D.C. Circuit involving the Hughes Glomar Explorer, a Cold War-era oceanic vessel. *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).  In *Phillippi*, the CIA claimed that it could neither confirm nor deny the existence or nonexistence of records requested by the plaintiff because the United States' involvement (or lack thereof) in the subject matter of the request was classified and exempt from disclosure under FOIA.  The refusal to confirm or deny the existence of requested records is now known as a *Glomar* response.

[3]  The exhaustion of administrative remedies by plaintiff is not at issue here.  Since the CIA did not respond to plaintiff's appeal within 20 days, he is "deemed to have exhausted his administrative remedies with respect to such request," 5 U.S.C. § 552(a)(6)(C)(i), and may file suit pursuant to 5 U.S.C. § 552(a)(4)(B).

[4]  Plaintiff submitted a third FOIA request on February 11, 2014, seeking records related to the 2001 request. (Ex. 7 to Lutz Decl.)  This third request is not at issue in the present litigation.

### C. This Action and the CIA's Supplemental Search and Disclosures

As noted above, both parties have moved for summary judgment in their respective favors. The CIA moved on the ground that its *Glomar* response was justified pursuant to FOIA Exemptions 1 and 3. Plaintiff seeks summary judgment on the grounds that the CIA's search was inadequate and the *Glomar* response was improper, and therefore the Court should order the responsive records—if any—to be disclosed.

In the course of briefing those motions, plaintiff located two public documents concerning Dr. Florez on the CIA Freedom of Information Act Electronic Reading Room website, neither of which the CIA had disclosed in its response to the 2013 request and both of which disclose a publicly available fact: that Dr. Florez was a Cuban diplomat. (Exs. A, B to the Declaration of David E. McGraw, dated May 14, 2014 ("McGraw Decl.").) In light of those two documents having not been located during the CIA's initial search for responsive documents, the CIA undertook a supplemental search for responsive documents. (Lutz Suppl. Decl. ¶¶ 5-16.) The supplemental search included a text mining search of the CIA Automated Declassification and Release Environment ("CADRE"), the content of which overlaps with that of the Reading Room.[5] (Lutz Suppl. Decl. ¶¶ 4, 10.) This search resulted in the identification of two records, including one of the records plaintiff located in the electronic Reading Room.[6] (Lutz Suppl. Decl. ¶¶ 10-11; Exs. 1-2 to Lutz Suppl. Decl.) In addition, Information Review Officers searched the systems of two of the three remaining directorates, the Director of CIA Area and the Directorate of

---

[5]  Defendant had searched CADRE as part of its original search in response to the 2013 request but did not locate any responsive records at that time. Its initial search consisted of a case subject search and a document title search, but the CIA did not perform a text mining search, which searches all records for Dr. Florez's name, because, defendant claims, such a search is "unduly burdensome" and "frequently generates thousands of false hits," which "may have tens or hundreds of pages." (Lutz Supp. Decl. ¶¶ 5-6.)

[6]  The other document plaintiff located (Ex. B to McGraw Decl.) does not contain Dr. Florez's name and therefore the text mining search did not retrieve this document. (Lutz Supp. Decl. ¶ 10.)

Intelligence, for any documents responsive to plaintiff's request. (Lutz Suppl. Decl. ¶ 12.) The search resulted in the disclosure of four additional documents. (Lutz Suppl. Decl. ¶¶ 12, 16; Exs. 3-6 of Lutz Suppl. Decl.) As a result of these additional searches and supplemental disclosures, plaintiff no longer contests the adequacy of the CIA's search and instead now challenges solely the propriety of the *Glomar* response as to any records revealing a classified relationship with Dr. Florez.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that . . . any withheld documents fall within an exemption to the FOIA," *Carney v. U.S. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B)), and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Ctr. for Constitutional Rights v. CIA,* 765 F.3d 161, 166 (2d Cir. 2014) (citations and internal quotation marks omitted). The agency may rely on affidavits or declarations that "'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009). Affidavits submitted by the agency are "'accorded a presumption of good faith.'" *Carney*, 19 F.3d at 812. "Although conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden," *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009), "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73.

In *Wilner*, the Second Circuit held that an agency may "refuse to confirm or deny the existence of records" (*i.e.*, assert a *Glomar* response) "if the FOIA

exemption would itself preclude the *acknowledgement* of such documents." *Wilner*, 592 F.3d at 68 (internal quotation marks omitted).  When employing a *Glomar* response, "an agency must 'tether' its refusal to respond . . . to one of the nine FOIA exemptions."  *Id*. (citation omitted).  "The agency may meet its burden [of proving the applicability of an exemption] by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions."[7]  *Id*. (internal quotation marks omitted).  The Court must give "substantial weight to the agency's affidavits," so long as the "justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of bad faith."  *Id*. (internal quotation marks omitted).

Although a defendant "need only proffer one legitimate basis for invoking the *Glomar* response and FOIA Exemptions 1 and 3 are separate and independent grounds in support of a *Glomar* response," *see, e.g.*, *Wilner*, 592 F.3d at 72, this Court will analyze the applicability of both Exemptions 1 and 3 to defendant's *Glomar* response.

### B. The CIA's *Glomar* response is justified.

#### 1. *Exemption 1:  Classified National Defense or Foreign Policy Secrets*

"FOIA was enacted in order to promote honest and open government and to assure the existence of an informed citizenry." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355 (2d Cir. 2005) (internal quotation marks

---

[7]     Plaintiff argues that a *Glomar* response is only "justified in unusual circumstances, and only by a particularly persuasive affidavit," quoting the Second Circuit's opinion in *New York Times Co. v. U.S. Department of Justice*, 756 F.3d 100, 122 (2d Cir. 2014).  However, the Court declines to read this language as explicitly or implicitly overruling the standard in *Wilner* requiring that the affidavits need simply be "detailed" and "show[] that the information logically falls within the claimed exemptions."  *Wilner*, 592 F.3d at 68 (internal quotation marks omitted).  The Second Circuit made the statement in reference to "no number, no list" responses to FOIA requests, *see New York Times*, 756 F.3d at 121-22, which differ materially from *Glomar* responses in that the former admit that the agency has responsive documents whereas the latter do not.  *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 433 (D.C. Cir. 2013).

omitted).  For this reason, "'disclosure, not secrecy, is the dominant objective of the Act.'"  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Accordingly, "FOIA mandates disclosure of records held by a federal agency . . . unless the documents fall within enumerated exemptions" pursuant to 5 U.S.C. § 552(b). *Klamath Water Users*, 532 U.S. at 7 (citation omitted).

Exemption 1 permits a federal agency to withhold records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1). Executive Order 13,526 sets forth the current standard for classification, which consists of four requirements: "(1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage."  Exec. Order No. 13,526, §§ 1.1(a)(1)-(4).  In turn, the Executive Order defines "damage to the national security" as "harm to the national defense or foreign relations of the United States . . . taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." *Id*. §§ 1.1(a)(4), 6.1(l).  The Executive Order expressly provides that an agency "may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." *Id*. § 3.6(a).

The CIA submits the declarations of Martha M. Lutz, the Chief of the Litigation Support Unit of the CIA, in support of its motion.  The declarations state that the *Glomar* response is proper because the acknowledgement of the existence of any records, other than those "reflecting an open or otherwise acknowledged connection to [Dr. Florez]," (Lutz Decl. ¶ 33), would reveal

8

properly classified information concerning "intelligence activities" and "intelligence sources and methods," the disclosure of which "reasonably could be expected to result in damage to national security." (Lutz Decl. ¶ 37 (citing Exec. Order No. 13,526, § 1.4(c)).)

Plaintiff does not contest that the information meets the first three requirements of classification; *i.e.*, that (1) Lutz is an original classification authority and that she assessed the current classification of the information; (2) the information is under the control of the U.S. government; and (3) any records, should they exist, fall within the category of "intelligence activities" and "intelligence sources and methods." (Lutz Decl. ¶¶ 2, 37.) Plaintiff contends solely that Exemption 1 is inapplicable because the disclosure of decades-old documents would not, as a factual matter, result in damage to national security.

In its declarations the CIA explains that hostile groups, such as terrorist organizations and foreign intelligence services, often search, gather, and analyze seemingly disparate pieces of information pertaining to clandestine CIA activities in order to devise methods of thwarting them. (*See* Lutz Decl. ¶ 39.) "Even where the subject of an intelligence interest or an individual with whom the CIA has engaged in intelligence operations is no longer of interest or engaged in operations, the CIA's adversaries continue to seek such information, as it may reveal . . . how the CIA currently focuses its intelligence activities." (*Id*.) Therefore, the CIA maintains, "acknowledging the existence or nonexistence of the requested records reflecting a classified connection to the CIA reasonably could be expected to cause damage to the national security by disclosing whether or not the CIA has or had an intelligence interest in Florez or his associates, disclosing whether or not the CIA engaged in intelligence operations involving him and the location of those operations, and indicating to the CIA's adversaries how the CIA would or would not choose to focus its intelligence activities on other individuals." (*Id*. ¶ 40.)

Furthermore, the CIA explains that disclosing any such records could cause "serious damage to U.S. national security" by revealing "whether or not the CIA maintained any human intelligence sources related to an interest in Florez" and by "identifying the access or lack of access any such sources had to intelligence

9

concerning Florez." (*Id*. ¶¶ 41, 44.) Human intelligence sources are vital to the CIA's ability to gather intelligence from around the world, and they often understandably require "an arrangement of absolute secrecy." (*Id*. ¶ 41.) If the government breaches these assurances of confidentiality by disclosing whether or not the CIA maintains classified records on such sources, it may jeopardize the safety of those sources and their families as well as impair future recruiting. "[T]he damage occasioned by one [revelation could] be incalculable for many others." (*Id*. ¶ 42 (explaining that "the exposure of one source in a chain of intelligence sources can ravage an entire spectrum of sources" and provoke retaliation).)

The CIA also avers that the acknowledgement of the existence of records pertaining to a classified connection with Dr. Florez "could be expected to cause damage to the national security by alerting individuals of intelligence interest to what methods the CIA employed or did not employ with regard to Florez." (*Id*. ¶ 48.) Such disclosures could allow the CIA's adversaries to take appropriate countermeasures to neutralize such methods, or, at a minimum, highlight how the CIA allocates its resources, according to Ms. Lutz. (*Id*. ¶¶ 45-48.)

This Court concludes that the CIA has met its burden of establishing that FOIA Exemption 1 supports its *Glomar* response. The CIA's declarations are "relatively detailed and nonconclusory," *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488-89 (2d Cir. 1999) (internal quotation marks omitted), and its explanations of potential harm to national security are both "logical" and "plausible," *Wilner*, 592 F.3d at 73. Unlike an affidavit which summarily recycles the language of the classification standards or exempting statutes, *see, e.g.*, *Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 831 (D.C. Cir. 1979), the CIA has outlined how any acknowledgment of the existence of the requested records would reveal classified information regarding intelligence activities, sources, and methods, and why that information should logically remain classified. Such declarations are given "substantial weight" when offered in the context of national security. *Wilner*, 592 F.3d at 68 (internal quotation marks omitted); *see also Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) ("The test is not whether the court

personally agrees in full with the CIA's evaluation of the danger—rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the CIA is expert and given by Congress a special role.")

Despite plaintiff's exhortations, the age of the requested records does not render the Lutz declarations "implausible." The U.S. Supreme Court has recognized that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service. . . . Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to close up like a clam." *Sims*, 471 U.S. at 175 (internal quotation marks omitted). For this reason, the D.C. Circuit upheld the CIA's *Glomar* response as to the existence of 50 year-old records relating to a deceased Colombian politician because "it is logical to conclude that the need to assure confidentiality to a foreign source includes neither confirming nor denying the existence of records *even decades* after the death of the foreign national." *Wolf v. CIA*, 473 F.3d 370, 377 (D.C. Cir. 2007) (emphasis added).

Here, the CIA addressed the passage of time in its declarations, explaining that the government's breach of a promise of confidentiality given to a "human intelligence source," in the parlance of the CIA, "whether three or thirty years later" could reasonably impair relations with current sources, deter future recruiting, and provoke retaliation. (Lutz Decl. ¶¶ 42-44.) This Court credits the logic of this explanation, just as the D.C. Circuit has in the past in similar circumstances. *See Wolf*, 473 F.3d at 377; *see also Larson*, 565 F.3d at 864-65 (affirming the non-disclosure of records relating to violence in Guatemala in the 1970s and 1980s and declining an invitation to examine "whether the passage of

11

time or change in political environment . . . rendered classification less necessary").[8]

*Oglesby v. U.S. Department of Army*, 79 F.3d 1172 (D.C. Cir. 1996), upon which Sergio leans, cannot bear the weight he puts on it. In *Oglesby*, the plaintiff requested World War II vintage documents about a Nazi general. The court expressly stated that it does not "believe that the passage of time alone is enough to discredit an otherwise detailed and persuasive affidavit," and "the mere passage of time is not a per se bar to reliance on exemption 1." *Id*. at 1183. Further, the *Oglesby* court distinguished another case plaintiff relies on, *King v. U.S. Department of Justice*, because that case "involved a request for documents which had been classified under [a prior] executive order which specifically directed the agency to consider '[loss of the information's sensitivity with] the passage of time,'" and the agency had failed to substantively address that concern in its declarations. 79 F.3d 1172, 1183 n.4 (citing *King v. U.S. Dep't of Justice*, 830 F.2d 210, 226 (D.C. Cir. 1987)). The relevant executive order here—Executive Order 13,526—does not mandate such an inquiry.

*Hetzler v. Record/Information Dissemination*, 896 F. Supp. 2d 207 (W.D.N.Y. 2012) is also distinguishable. There, the plaintiff sought records related to her deceased father, an Irish politician. Although the district court was not persuaded that the disclosure of the requested records could damage national security in light of, *inter alia*, the age of the records and the fact that the subject of the records was deceased, in that case—unlike this one—"all of the information" the district court ordered defendants to release "was declassified decades ago."

---

[8] The President of the United States recently declared that the United States will seek to normalize diplomatic relations with Cuba. The White House, Office of the Press Secretary, *Fact Sheet: Charting a New Course on Cuba* (Dec. 17, 2014), http://www.whitehouse.gov/the-press-office/2014/12/17/fact-sheet-charting-new-course-cuba. That announcement, which was made after these motions were fully briefed, does not alter the Court's conclusion. *See, e.g.*, *Larson*, 565 F.3d at 865 ("The judiciary is in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies regarding questions such as whether a country's changed political climate has yet neutralized the risk of harm to national security posed by disclosing particular intelligence sources." (internal quotation marks omitted)).

*Id*. at 213-14. Here, the CIA is not asserting the *Glomar* response as to records that have been declassified and has disclosed those declassified records that regard Dr. Florez. It claims that the withheld documents—if any there be—are still classified.[9]

### 2. *Exemption 3: Matters Specifically Exempted From Disclosure by Statute*

Exemption 3 covers matters "specifically exempted from disclosure by statute" so long as the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). In evaluating an agency's invocation of FOIA Exemption 3, a court "must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3 . . . [and] whether the withheld material satisfies the criteria of the exemption statute." *Wilner*, 592 F.3d at 72 (internal quotation marks omitted). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Id.* (internal quotation marks omitted).

Accordingly, to support withholding information on the basis of Exemption 3, an agency need not show that there would be any harm to national security from disclosure; it need show simply that the withheld information falls within the statute's purview. *See Wilner*, 592 F.3d at 72; *Larson*, 565 F.3d at 868; *see also Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency*, 678 F.3d 926, 931 (D.C. Cir. 2012) ("NSA need not make a specific showing of potential harm to national security in order to justify withholding information" when exempt from

---

[9] Even were the Court to assume that the Lutz declaration cannot sustain its claim that decades-old documents "reasonably could be expected to cause damage to the national security," plaintiff would find no relief because the *Glomar* response is independently justified on the basis of Exemption 3, which does not require an express finding of harm. *See* the discussion of that exemption, *infra*.

13

disclosure by statute "because 'Congress has already, in enacting the statute, decided that disclosure of [the information] is potentially harmful.'").

The CIA relies on two statutes that specifically preclude the disclosure of records plaintiff seeks. First, Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), requires that the Director of National Intelligence "protect intelligence sources and methods from unauthorized disclosure." According to the Supreme Court, "Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure." *Sims*, 471 U.S. at 168-69. Courts have recognized that the CIA may rely on the terms of the National Security Act to withhold records. *See, e.g.*, *Larson*, 565 F.3d at 865.

Second, Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507, provides that, "[i]n the interests of the security of the foreign intelligence activities of the United States and in order further to implement . . . the Director of National Intelligence['s] . . . responsib[ility] for protecting intelligence sources and methods from unauthorized disclosure," the CIA shall be exempted from the provisions of any law that "require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."

Both the National Security Act and Central Intelligence Agency Act are exempting statutes within the meaning of Exemption 3, *see, e.g.*, *Sims*, 471 U.S. at 168 (National Security Act), *Wilner*, 592 F.3d at 71-72 (National Security Act), *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479 (S.D.N.Y. 2010) (both), and plaintiff has not disputed that fact.

In relying upon Exemption 3 to justify its *Glomar* response, the CIA contends that acknowledging the existence or nonexistence of the records Sergio seeks could reasonably be expected to lead to the unauthorized disclosure of intelligence sources and methods as well as clandestine intelligence activities, which are at the core of the CIA's functions. As discussed above, the Lutz declaration adequately supports the CIA's *Glomar* response. (*See, e.g.*, Lutz Decl.

¶¶ 41-44, 50 (intelligence sources); ¶¶ 45-48, 50 (intelligence methods); ¶¶ 39-40, 51 (intelligence activities).)

Plaintiff's citation of cases inquiring whether the requested records fall within some "zone of secrecy" necessary to protect "intelligence sources and methods" is inapposite. In *Navasky v. CIA*, 499 F. Supp. 269, 274-75 (S.D.N.Y. 1980), the district court held that Exemption 3 did not protect authors, publishers, and books of clandestine propaganda from disclosure. Because the court doubted that the term intelligence encompassed "covert propaganda activities" such as book publishing, the court rejected the CIA's reliance on Exemption 3. *Id*. Here, plaintiff does not dispute that the requested records concern intelligence methods and sources, nor can he. The CIA has explained how the acknowledgement of records relating to a classified relationship with Dr. Florez would reveal activities, such as clandestine human intelligence gathering, which "lie at the heart of the CIA's mission." (Lutz Decl. ¶ 39.) Plaintiff merely argues that, based on a wealth of public information, such methods are no longer secret. As will be explained in more detail below, the fact that "it is no secret" the CIA may "use" foreign officials in some capacity does not mean that the CIA can no longer protect the specifics of its tactics.

Similarly, plaintiff's reliance on *Terkel v. AT&T Corp.*, 441 F. Supp.2d 899 (N.D. Ill. 2006) is misplaced. There, the National Security Agency attempted to prevent AT&T from disclosing whether it provides customer call information to the agency on the basis that the disclosure would reveal agency activities protected by section 6 of the National Security Act. *Id*. at 905. The Court was skeptical that section 6 would cover such activity, but ultimately declined to rule on the matter. *Id*. Nothing in the CIA's declarations in this action concerns activity by non-agency organizations, and plaintiff presents no evidence to the contrary.

The Court finds that the CIA's *Glomar* response is justified under both Exemption 1 and Exemption 3.

### C. The documents already publicly disclosed do not vitiate the CIA's *Glomar* response.

Plaintiff contends, however, that the CIA cannot invoke these exemptions because (1) it has already publicly disclosed information about Cuban-American relations and an intelligence interest in Cuba generally and (2) several documents available publicly from the CIA refer specifically to Dr. Florez. Plaintiff relies on the principle that where information has been officially and publicly disclosed, "its disclosure may be compelled even over an agency's otherwise valid exemption claim." *See, e.g.*, *Wolf*, 473 F.3d at 378 (internal quotation marks omitted).

The leading case on this issue is *Wilner v. National Security Agency*, 592 F.3d 60 (2d Cir. 2009). In *Wilner*, the Second Circuit made it clear that "an agency may invoke the *Glomar* doctrine in response to a FOIA request [even if the request is] regarding a publicly revealed matter." 592 F.3d at 70. In fact, "[a]n agency only loses its ability to provide a *Glomar* response when the existence or nonexistence of the *particular* records covered by the *Glomar* response has been officially and publicly disclosed." *Id.* (emphasis added). Even where information has been officially disclosed, any additional classified information must be disclosed only if it is "as specific as the information previously released." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (internal quotation marks omitted).

In *Wilner*, a panel of the Second Circuit upheld a *Glomar* response as to the "details of the [Terrorist Surveillance Program's] operations and scope" even though the President and the CIA Director had officially acknowledged the existence of the Program, because neither the President nor other members of the national government ever publicly confirmed or denied "the specific methods used, targets of surveillance, and information obtained through the [P]rogram." 592 F.3d at 69-70 (internal quotation marks omitted); *compare Wilner*, 592 F.3d at 69-70, *with New York Times*, 756 F.3d at 122 (rejecting the *Glomar* response where the government sought to withhold the name of the agency involved in targeted drone strikes because the head of the CIA had "publicly

identified [the] CIA as an agency that had an operational role in targeted drone killings").

Plaintiff argues that the public disclosure of records relating to events such as the Bay of Pigs invasion or the Cuban missile crisis prohibits the CIA from making a *Glomar* response here. However, he is not requesting records on those operations. Rather, he is "requesting information or records regarding" his father, Dr. Florez. (Ex. 3 to Lutz Decl.) The only CIA-released documents that relate to Dr. Florez are the two documents plaintiff located on the Reading Room website—Exhibits A and B to the McGraw Declaration. Both documents convey the same information: "A former Foreign Ministry official advised an American Embassy officer on 23 September that in view of the temperament of the new Cuban chargé d'affaires in Washington, [Dr. Florez], the United States should expect him to provoke a US request for his recall as a pretext for a Cuban demand that Ambassador Bonsal be called home." (Ex. A to McGraw Decl.)[10] Plaintiff contends that these documents show (1) "a CIA interest in Florez," (2) "that Florez was the target of clandestine CIA monitoring," and (3) "that the CIA was monitoring Florez through confidential sources." (*See* Pl.'s Reply Mem. of Law in Further Support of Pl.'s Cross-Mot. for Summ. J. and in Opp'n to Def.'s Mot. for Summ. J. at 5.) Therefore, the question before this Court is whether the CIA's *Glomar* response was appropriate given that certain information about Dr. Florez has in fact already been disclosed publicly by the CIA. That is, if the CIA's disclosures establish the existence of any intelligence source, method, or activity related to Dr. Florez, the CIA can no longer assert a *Glomar* response as to any documents whose existence would reveal the same information.

The two documents plaintiff identified do not show that the CIA was employing Dr. Florez as an intelligence source or targeting him in any way. They certainly do not reveal any intelligence activity conducted by Dr. Florez or

---

[10] Similarly, the other document plaintiff located states "An embassy officer [was] recently informed by a friend in Cuban foreign ministry that Cuba [is] preparing [to] break diplomatic relations with US. New Cuban chargé in Washington may provoke US request for his recall as pretext for ouster of US Ambassador." (Ex. B to McGraw Decl.)

17

any relationship that he may have had with the CIA.  By necessity, the CIA collects and relies upon a plethora of information, but it does not follow that all information reviewed by the CIA is perforce clandestine or classified intelligence.

Even assuming *arguendo* that these two documents reveal an "intelligence interest" in Dr. Florez, the CIA has already disclosed the documents revealing an "overt or otherwise acknowledged connection between the CIA and Florez." (Lutz Suppl. Decl. ¶ 18.)  In particular, it has searched for and released records relating to the fact that Dr. Florez might provoke a U.S. request for his recall as Cuban chargé d'affaires, according to an "American Embassy officer." (Exs. 1-2 to Lutz Suppl. Decl.)  In addition, the CIA has disclosed four "Biographic Reference Aids," which simply list Dr. Florez's various publicly known postings as a Cuban diplomat. (Exs. 3-6 to Lutz Suppl. Decl.)  Based on the effort shown by the CIA in its supplemental search and disclosures and the lack of contrary evidence revealing any *classified* interest in Dr. Florez, the CIA's *Glomar* response remains valid.  *See, e.g., Bartko v. U.S. Dep't of Justice*, __ F. Supp. 2d __, 2014 WL 3834343, at *5 (D.D.C. Aug. 5, 2014) (where the Department of Justice has publicly disclosed the existence of a specific investigation, it is required to "search for records associated with" that investigation, but "the *Glomar* response with respect to other investigations is proper, and the Department need not acknowledge anything further").

Because the Court finds that the Lutz declarations are sufficient and the *Glomar* response is proper, any "*ex parte* and *in camera* review of additional, confidential material is unnecessary and beyond the role assigned to the judiciary by applicable law."  *Wilner*, 592 F.3d at 76; *see also Larson*, 565 F.3d at 867 ("Once satisfied that proper procedures have been followed and that the information logically falls into the exemption claimed, the courts need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith." (internal quotation marks omitted)).  "Recognizing the relative competencies of the executive and judiciary," this Court "affirm[s] our 'deferential posture in FOIA cases regarding the uniquely executive purview of national security,'" *Wilner*, 592 F.3d at 76, and

18

declines plaintiff's requests for an index of, or an *in camera* review of, responsive records, if they should exist.

### III.  CONCLUSION

As set forth above, the Court finds that the CIA's *Glomar* response was justified by FOIA Exemptions 1 and 3. Defendant's motion for summary judgment is therefore granted and plaintiff's cross-motion for summary judgment is denied. The Clerk of Court is directed to enter judgment accordingly.

Dated: New York, New York
       February 19, 2015

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.